J-S02031-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.S.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: E.D., FATHER | : | |
| | : | No. 991 EDA 2016 |

Appeal from the Decree February 25, 2016
in the Court of Common Pleas of Philadelphia County
Family Court at No(s):  CP-51-AP-0000289-2015,
FID: 51-FN-001-287-2014

BEFORE:  FORD ELLIOTT, P.J.E., STABILE, and MOULTON, JJ.

MEMORANDUM BY MOULTON, J.:　　　　　　**FILED FEBRUARY 14, 2017**

E.D. ("Father") appeals from the decree entered February 25, 2016 in the Philadelphia County Court of Common Pleas by the Honorable Allan L. Tereshko, which involuntarily terminated his parental rights to his son, A.S.R. ("Child"), born in November 2010, pursuant to the Adoption Act, 23 Pa.C.S. § 2511(a)(1), (2), and (b).[1]  We affirm.

The trial court set forth the following factual and procedural history:

> On November 17, 2010, G.R. gave birth to A.S.R.  At the time of the delivery, G.R. tested positive for cocaine, benzodiazepines and marijuana.  The Child, A.S.R.[,] tested positive for cocaine and marijuana.

―――――――――――――――――――――――――――――

[1] The trial court also terminated the parental rights of G.R. ("Mother") on the same date.  Mother has not filed an appeal from the decree terminating her parental rights, nor is she a party to the instant appeal.

On November 21, 2010, DHS visited the family home and determined that it was safe and that G.R. was adequately prepared for A.S.R. G.R. agreed to accept Child Abuse Prevention and Treatment Act (CAPTA) services; however, she failed to make herself available to the Extended Assessment Team. She later made phone contact to confirm that she had been arrested for outstanding bench warrants and that she was incarcerated at Riverside Correctional Facility (RCF). G.R. stated that the Child, A.S.R.[,] was in the care of his Maternal Grandmother, C.R. G.R. provided DHS with the telephone number for C.R., as G.R. did not have her address. DHS' efforts to contact C.R. were unsuccessful.

. . .

In December 2013 and January 2014, DHS received allegations that G.R. had recently been released from prison; that during her incarceration, A.S.R. had lived with his maternal grandmother, C.R.; that during this timeframe, A.S.R. had visited with his Father, E.D.; that A.S.R. may have been sexually abused by Father; that G.R. and E.D. had a history of domestic violence; and that C.R. lacked medical insurance for A.S.R.

On February 27, 2014, DHS implemented In-Home Services through Community Umbrella Agency CUA-Northeast Treatment Center (NET).

On March 28, 2014, CUA-NET held an initial Single Case Plan (SCP) meeting. The goal for A.S.R. was to "Stabilize Family." The parental objective established for G.R. was to: 1) make her whereabouts known to DHS/CUA-NET. The parental objective[] established for E.D. was to: 1) make his whereabouts known to DHS/CUA-NET. The parental objective for [then putative father] T.M. was to: 1) make his whereabouts known to DHS/CUA-NET. (Note: pursuant to the paternity test of E.D. confirming his paternity of the Child, T.M. was dismissed from the case as a putative father). None of the parents participated in the meeting and their whereabouts remained unknown to DHS and CUA-NET.

On June 2, 2014, DHS received a General Protective Services (GPS) Report alleging that on May 29, 2014, Mother, G.R., went to the home of a male friend, M.G.,

and stated that she and A.S.R. had been evicted from their home and that she and A.S.R. needed somewhere to reside. G.R. left A.S.R. in M.G.'s care on May 30, 2014 at 2:00 p.m. and stated that she was going to the store. G.R. failed to return to M.G.'s home for A.S.R. and she also failed to respond to any telephone calls. M.G. was unable to continue caring for A.S.R. G.R. was believed to have substance abuse problems. G.R. has a past criminal history and has been arrested for prostitution and drug possession. This Report was substantiated.

On June 2, 2014, M.G. contacted the police and stated that he was no longer able to care for A.S.R. and that G.R.'s whereabouts were unknown.

On June 2, 2014, A.S.R. was transported to DHS by Philadelphia Police.

On June 2, 2014, DHS obtained an Order of Protective Custody (OPC) and placed A.S.R. in a NET foster home.

A Shelter Care Hearing was held on June 4, 2014 before the Honorable Jonathan Q. Irvine. The Court lifted the OPC and ordered the legal custody of the Child to transfer to DHS, and the Child be placed in foster care.

On June 16, 2014, Mother was arrested and charged with Unauthorized Use of Motor Vehicle.

An Adjudicatory Hearing was held on June 16, 2014 before Judge Kevin M. Dougherty. The Court discharged the temporary commitment, adjudicated A.S.R. Dependent and committed him to DHS. The Court ordered that CUA-NET move A.S.R. to an appropriate placement, that DHS complete a parent locator search for A.S.R.'s father(s); and that Mother and Maternal Grandmother, C.R., be referred to the Clinical Evaluation Unit (CEU) for a forthwith drug screen, dual-diagnosis assessment and monitoring. Supervised visits with Mother shall occur at the Agency, once she makes herself available to DHS. Grandmother may receive visitation once a negative drug screen has been provided. CUA to ensure Child receives a full medical evaluation, dental and eye examination, forthwith. CUA to ensure Child attends appointment at Elwyn. Child to be referred to BHS for an evaluation. (Autism)

. . .

A Permanency Review Hearing was held on September 15, 2014 before the Honorable Allan L. Tereshko. The Court held that the Child shall remain in the legal custody of DHS, and remain in foster care through the NET CUA.

. . .

A Permanency Review Hearing was held on November 6, 2014 before the Honorable Kevin M. Dougherty. The Court held that the Child shall remain in the legal custody of DHS, and remain in foster care through the NET CUA. Mother's visitation is bi-weekly Supervised at the Agency. Child receives speech therapy through Elwyn, and attends daycare. . . . Father's name is E.D., date of birth is 9/11/1966. DHS is to use Parent Locator Services (PLS) on Father. Mother is referred to the Clinical Evaluation Unit (CEU) for a forthwith drug screen, dual-diagnosis assessment, monitoring, and three randoms prior to the next Court date. CUA to refer Mother to ARC. CUA is to have a forthwith single case plan meeting, to include Child Advocate.

On November 7, 2014, CUA-NET held an SCP revision meeting. The goal for Child was "Return to Parent". The parental objectives for Father, E.D., were: 1) make whereabouts known to DHS/CUA-NET; and 2) comply with paternity testing. No parental objectives were established for T.M. as he confirmed to CUA-NET that he was not the biological father of the Child. Mother was invited to the meeting, however, she failed to participate. E.D. and T.M. failed to participate in the meeting and their whereabouts remain unknown to DHS and CUA-NET.

A Permanency Review Hearing was held on February 2, 2015 before the Honorable Allan L. Tereshko. The Court held that the Child shall remain in the legal custody of DHS, and remain in foster care through Second Chance. . . .

On March 13, 2015, CUA-NET held a SCP revision meeting. The parental objectives established for Father, E.D. were to: 1) make whereabouts known to DHS /CUA-NET, and 2) comply with paternity testing. No parental objectives were established for T.M. as he confirmed to

CUA-NET that he was not the biological father of the Child. E.D. and T.M. failed to participate in the meeting and their whereabouts remained unknown to DHS and CUA-NET.

. . .

E.D. has failed to achieve full and continuous compliance with the established FSP objectives to facilitate reunification with his Child. [H]e has also failed to consistently visit, plan for, and provide for the Child throughout his time in placement.

A Permanency Review Hearing was held on May 18, 2015 before the Honorable Allan L. Tereshko. The Court held that the Child shall remain in the legal custody of DHS, and remain in a pre-Adoptive Home through Concilio - supervised by CUA-NET.

The Court ordered a paternity test for E.D., who was referred to the Genetic Testing Unit, 9th floor, Room 968.

A Paternity Test Report (DNA Test Report) was received in the chambers of the Honorable Allan L. Tereshko. The results indicate that probability of paternity is 99.9999% for this putative father, E.D.

## TERMINATION HEARING

On February 25, 2016, this Court held a Goal Change/Termination Hearing and heard testimony on DHS's Petition to terminate Fathers rights as to his Child, and change the Permanency Goal to Adoption. Father was present and represented by his attorney.

The Assistant City Solicitor first presented the testimony of Lauren Spearman, Social Work Supervisor for NET[-] CUA[], who was the Case Manager. She testified the Child was currently with the pre-adoptive foster parent, C.B. though Concilio, where he has been since June 2014. She testified Father has been involved with the Child recently as he reached out to CUA in December 2015. She stated for the first year that Child was in care, Father was not available for CUA services.

Ms. Spearman testified that Father's paternity was established in June 2015, and from that time until

December 2015, Father did not reach out to her agency and he had no involvement with the Child.

She further testified Father does not have appropriate housing for reunification, and has not established any type of parental bond or relationship with his Child. She also stated her agency set up visits for Father but he did not show up to the first one or two, and then visitation was set up in January 2016.

On cross-examination, Ms. Spearman stated the Child has a strong bond with his foster mother, and believes it would be detrimental to remove the Child from the foster parent. She stated the Child looks to the foster parent, C.B., as his mother, and refers to her as "Mom." The foster family includes other children and they all refer to A.S.R. as their little brother.

Ms. Spearman further stated A.S.R., who is currently five years old, is in love with his foster mother. He follows her, and she has the protective capacities as a mother would have and if she steps out of the room, he follows her, and wants to be with her. She opined it would be detrimental if the Child was removed from this home.

Further on cross-examination, Ms. Spearman testified A.S.R. is doing phenomenal in the foster home and is up to date on medical and dental care. He receives therapeutic services through the Northeast Treatment Center (TSS Services).

She admitted she was not aware of who the Father of the Child was from August 2015, when she first received the case, because she did not have the results of the paternity test. She further admitted she did not conduct any investigation as to who the father was. She stated Father made contact with her and visits were scheduled in January 2016 after she got an email from the Child Advocate and the City Solicitor in December 2015.

On re-direct examination, Ms. Spearman stated that between the time the Child came into care in June 2014 until May of 2015, Father's only objectives were to make his whereabouts known, and he did not. Further, when Father became aware he was the biological father of A.S.R.

in June 2015, he failed to make contact or do outreach to her from that time until December 2015.

The Father, E D , was next to testify. He stated he took the Mother to the hospital when A.S.R. was born. He indicated that he and Mother did not live together but that mother would entrust him to take the Child at times because she was still using. He further stated that he cared for him in an apartment in South Philadelphia and then took him to his apartment. He fed him, changed his diapers and everything because his mother was using drugs.

He testified he visited his Child three or four times a week when the Child lived with his Mother and Maternal Grandmother. A.S.R.'s mother left him in maternal grandmother's care when the Child was between nine months and a year old. Maternal Grandmother called Father and told him.

He stated he did not see his Child from December 2013 until December 2015 because of the Mother and Maternal Grandmother's false accusations that he had tried to molest his son. He became aware the Child was placed when a social worker on his son's case, G.M., contacted him.

Father further testified he was unaware of the family service plan goal objectives until after G.M. had contacted him and packages of mail started arriving at his address at 1425 West Erie Ave., Apt. 3.

On cross-examination, Father stated he did not have any contact with his Child between June of 2015, when the DNA test results came in, until December 2015. He did not know what to do, and when he received paperwork from Community Net with Ms. Spearman's information on it, he contacted her. He admitted he has seen his Child only two times in two years.

Trial Court Opinion, 7/12/16, at 1-11 (internal citations omitted) ("1925(a) Op.").

On February 25, 2016, the same day as the hearing, the trial court entered a decree terminating Father's parental rights to Child pursuant to sections 2511(a)(1), (2) and (b).

On March 22, 2016, Father timely filed a notice of appeal, together with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. (a)(2)(i) and (b).

Father raises six questions on appeal:

1. Whether the Trial Court erred by terminating the parental rights of [Father] under 23 Pa.C.S.A. §2511(a)(1)?

2. Whether the Trial Court erred by terminating the parental rights of [Father] under 23 Pa.C.S.A. §2511(a)(2)?

3. Whether the Trial Court erred by terminating the parental rights of [Father] under 23 Pa.C.S.A. §2511(a)(5)?

4. Whether the Trial Court erred by terminating the parental rights of [Father] under 23 Pa.C.S.A. §2511(a)(8)?

5. Whether the Trial Court erred by finding, under Pa.C.S.A. §2511(b), that termination of [Father's] parental rights best serves [Child's] developmental, physical and emotional needs and welfare?

6. Whether DHS failed to use reasonable efforts to reunite [Child] with [Father]?

Father's Br. at 5.[2]

---

[2] Although Father challenges the trial court's decision to terminate under sections 2511(a)(1), (2), (5), (8), and (b), the court terminated Father's parental rights under sections 2511(a)(1), (2), and (b) only, and did not terminate under sections 2511(a)(5) and (8).

We consider Father's issues mindful of our well-settled standard of review.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted). The Pennsylvania Supreme Court has explained the reason for applying an abuse of discretion to termination decisions:

> [U]nlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012) (internal citation omitted).

The petitioner has the burden of proving by clear and convincing evidence that the asserted statutory grounds for seeking termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa.Super. 2009).

This Court need only agree with any one subsection of section 2511(a), along with section 2511(b), in order to affirm the termination of parental rights. *In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*). We conclude that the trial court properly terminated Father's parental rights pursuant to sections 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.**--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .
>
> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions

> described therein which are first initiated subsequent to
> the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), (b).

To terminate parental rights under section 2511(a)(2), the moving party must produce clear and convincing evidence regarding the following elements: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. *See In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa.Super. 2003).

This Court has stated that a parent is required "to make diligent efforts toward the reasonably prompt assumption of full parental responsibilities." *In re A.L.D.* 797 A.2d 326, 340 (Pa.Super. 2002) (quoting **In re J.W.**, 578 A.2d 952, 959 (Pa.Super. 1990)). Further, "[t]he grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *Id.* at 337. "[A] parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." *Id.* at 340.

This Court has stated that a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the

- 11 -

responsibilities of parenting." *In re Z.S.W.*, 946 A.2d 726, 732 (Pa.Super. 2008). Rather, "a parent's basic constitutional right to the custody and rearing of his or her child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *In re B., N.M.*, 856 A.2d 847, 856 (Pa.Super. 2004).

As Father's second and sixth questions on appeal arise out of section 2511(a)(2), we will address them together. Father argues that the trial court erred in terminating his parental rights to Child under section 2511(a)(2) because the evidence presented by DHS was not so clear and convincing as to establish sufficient grounds for termination of his parental rights. We disagree.

We find the following portion of the trial court's opinion relevant to our inquiry with regard to section 2511(a)(2):

> When questioned by the Court regarding paternity testing, Father admitted he did not ask for a paternity test until May 2015 when he asked for the test through [Greg Morgan], the social worker. He further stated he did not come to court to file a custody petition, although he believed he was the father of the Child.
>
> The Court reasoned that although Father claimed he cared for the Child, he did not contact the agency, nor did he try to remedy the conditions that brought the Child into care. Father admitted he has seen his Child only two times in two years.
>
> After hearing the credible testimony of the DHS Social Worker, the Court found by clear and convincing evidence, that her observations and conclusions regarding Father's

lack of ability to fulfill his parental responsibilities were persuasive.

1925(a) Op. at 17 (citations omitted).

Father testified that he agreed to help Maternal Grandmother ("C.R.") raise Child because Mother was still using drugs, and he would keep Child for a designated period of time and then return Child to C.R. N.T., 2/25/16, at 32. Father further testified that this arrangement lasted "basically for three years." *Id.* Father stated that this arrangement ended, and he did not see Child from December 2013 until December 2015, because Mother and C.R. falsely accused him of attempting to molest Child. *Id.* at 33. Father further testified that he did not know Child was in DHS custody until May 2015 when Mr. Morgan contacted him. At that time, he requested a paternity test. *Id.* at 39.

On cross-examination, Father stated that he did not have any contact with Child between June 2015, when paternity was established, and December 2015, because he did not know what to do, and that it was not until he received paperwork from CUA-NET with Ms. Spearman's information that he reached out to CUA-NET. *Id*. at 39. He admitted, however, that he had Mr. Morgan's contact information, but did not attempt to reach him. *Id.* at 40.

Spearman testified that Father's paternity was established in June 2015, and Father did not reach out to CUA-NET until December of 2015. *Id.* at 9-10. Spearman continued that Father has not had sufficient visits to establish a relationship with Child because Father missed visits for failing to

confirm the visits on time. *Id.* at 11. Ms. Spearman further testified that Father lacks the appropriate housing for reunification. *Id.* at 25-26.

Instantly, the trial court notes that although Father claims he cares for Child, Father did not contact CUA-NET and did not try to remedy the conditions that brought Child into DHS care. 1925(a) Op. at 17. At the conclusion of the hearing, the trial court found:

> I think [F]ather clearly had a reasonable belief that this child was his and did nothing about it and in fact walked away from the child for a substantial period of time in this child's life when the child was most vulnerable and the child's most formable periods. The father in fact abandoned this child. And for father to come in now and suggest that he resume a role in the child's life that he abandoned many years ago, falls on deaf ears of this Court. Father has failed to remedy any of the issues that brought the child into care.

N.T, 2/25/16, at 43.

We conclude that the trial court's credibility and weight determinations are supported by competent evidence in the record. *See In re M.G.*, 855 A.2d 68, 73-74 (Pa.Super. 2004). We further conclude that the trial court did not abuse its discretion in finding grounds for termination of Father's parental rights pursuant to section 2511(a)(2).

Additionally, we reject Father's contention that his parental rights should not have been terminated because CYS failed to provide him with reunification services. Our Supreme Court recently held that reasonable reunification efforts are not necessary to support a decree terminating

parental rights pursuant to section 2511(a)(2). ***In re D.C.D.***, 105 A.3d 662, 672-73 (Pa. 2014). We have discussed the ***In re D.C.D.*** decision as follows:

> In ***In re D.C.D.***, ___ Pa. ___, 105 A.3d 662 (2014), our Supreme Court analyzed the language of Section 2511(a)(2) of the Adoption Act, as well as Section 6351 of the Juvenile Act, 42 Pa.C.S.A. § 6351. The Court reasoned that, while "reasonable efforts may be relevant to a court's consideration of both the grounds for termination and the best interests of the child," neither of these provisions, when read together or individually, requires reasonable efforts. The Court also concluded that reasonable efforts were not required to protect a parent's constitutional right to the care, custody, and control of his or her child.

***In re Adoption of C.J.P***., 114 A.3d 1046, 1055 (Pa.Super. 2015) (some internal citations omitted). Although it is unclear from the record why Father was not contacted following the positive paternity test, the agency's steps are but one consideration. Father, after being a part of Child's life for three years, did not take steps to remain in Child's life, and, for six months after receiving confirmation that he was Child's father, failed to take any steps to re-establish contact with Child. Further, in the two months after re-establishing contact, Father showed inconsistent visits with Child.

The trial court must also consider how terminating Father's parental rights would affect the needs and welfare of Child under section 2511(b). The focus under Section 2511(b) is not on the parent, but on the child. ***In re Adoption of C.L.G.***, 956 A.2d 999, 1008 (Pa.Super. 2008) (*en banc*). Pursuant to section 2511(b), the trial court must consider whether termination of parental rights would best serve the developmental, physical

and emotional needs of the child. *See In re C.M.S.*, 884 A.2d 1284, 1286-87 (Pa.Super. 2005).

With respect to section 2511(b), this Court has explained that "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." *Id.* at 1287. Further, the trial court "must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *Id*. However, "[i]n cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-763 (Pa.Super. 2008).

With regard to Child's bond with Father, the trial court emphasized "Father's failure to contact and maintain a relationship with his Child as demonstrated by the lengthy period between the DNA test results became available until the time he contacted the social worker to begin communication. This demonstrates his refusal to maintain a bond with [Child]." 1925(a) Op. at 18.

Spearman stated that Child is doing "phenomenal" in his foster home. N.T*.,* 2/25/16, at 13, and that Child refers to his Foster Mother as "Mom." *Id.* at 12. Spearman further testified that Foster Mother's family members fully accept Child, and call Child their little brother. *Id.* Spearman stated that Child is up to date on his medical and dental care, and is receiving

therapeutic services through Northeast Treatment Center. *Id.* at 13. Spearman concluded that it would be detrimental if Child was removed from Foster Mother's care because Child loves Foster Mother, and wherever Foster Mother is, Child wants to be with her. *Id.*

Further, our review of the record reveals no evidence of a bond between Father and Child. Father admitted that he has only seen Child two times in two years. *Id.* at 40. We find that the competent evidence in the record supports the trial court's determination that there was no bond between Father and Child which, if severed, would be detrimental to Child, and that the termination of Father's parental rights would best serve the needs and welfare of Child. *See In re M.G.*, 855 A.2d at 73-74.

Decree affirmed.
Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 2/14/2017